1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DAVID MELVIN,                              )    1:09-cv-01950 MJS HC
                                           )
                Petitioner,                )    ORDER DENYING PETITION FOR WRIT
                                           )    OF HABEAS CORPUS AND DECLINING
        v.                                 )    TO ISSUE CERTIFICATE OF
                                           )    APPEALABILITY
                                           )
KEN CLARK, Warden,                         )
                                           )
                Respondent.                )
_____           )

16

17

18

19

20

        Petitioner is a state parolee proceeding pro se with a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254. Respondent, Matthew Cate, as Secretary of the California
Department of Corrections and Rehabilitation, is hereby substituted as the properly named
respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Both parties have
consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 11, 18.)

21     **I.     PROCEDURAL BACKGROUND**

22

23

24

25

        Petitioner is currently on parole pursuant to a judgment of the Superior Court of
California, County of Fresno, following his conviction by jury trial on December 9, 2005, of
forcible sexual penetration and forcible oral copulation.[1] (CT[2], Vol. 2 at 366-67.) The trial court

26

27

        [1] Petitioner is still considered to be in the custody of the California Department of Corrections and
Rehabilitation while on parole. Accordingly, this court retains jurisdiction over the habeas petition. See Chaker
v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005).

28

        [2]"CT" refers to the Clerk's Transcript on Appeal lodged by Respondent with his response.

sentenced Petitioner to serve eight years in state prison. (Id.) Petitioner was released from custody on August 15, 2012, and is currently serving a five year parole term. (See ECF No. 31.)

Petitioner filed a direct appeal which was denied in a reasoned decision by the California Court of Appeal, Fifth Appellate District on October 3, 2007. (Lodged Doc. 1.) The California Supreme Court denied review on January 16, 2008. (Lodged Doc. 2.)

On April 9, 2008, Petitioner filed a habeas petition in the Fresno County Superior Court. (Lodged Doc. 3). The petition was denied on May 5, 2008. (Id.) Petitioner filed two additional petitions with the Fresno County Superior Court which were denied on May 29, 2008 and June 29, 2008, respectively. (Lodged Doc. 3.) Petitioner proceeded to file petitions for writ of habeas corpus with the Court of Appeal and California Supreme Court which were ultimately denied on July 22, 2009.

Petitioner filed the instant federal habeas petition on August 27, 2009. (Pet., ECF No. 1.) Petitioner raises the following nine claims for relief:

1. Improper denial of Petitioner's Wheeler/Batson motion based on the trial court finding no prima facie case of discrimination;

2. The trial court improperly reseated a juror that was previously subject to a peremptory challenge;

3. Insufficient evidence of guilt as to either offense for which Petitioner was convicted;

4. Improper application of the upper term sentence for each count;

5. The trial court improperly denied Petitioner's Marsden motion to obtain new trial counsel or proceed pro se;

6. Ineffective assistance of trial counsel;

7. Ineffective assistance of appellate counsel;

8. The abstract of judgment contains errors and improperly states restitution fines; and

9. Petitioner's parole term violates his constitutional rights.

Respondent filed an answer to the petition on September 16, 2010, and Petitioner filed a traverse on October 18, 2010. (Answer & Traverse, ECF Nos. 26, 28.)

1   **II.    FACTUAL BACKGROUND**[3]

2   PROSECUTION EVIDENCE

3       Virginia, who was in her 50's, suffered from grand mal and petit mal
epileptic seizures, rheumatoid arthritis, and a hip condition. Dr. Reinfurt, a
4   psychologist with specialized training in neuropsychology, administered IQ and
memory tests to Virginia and determined that her intellectual functioning was
5   within the borderline range – not average, but not mentally retarded. Her overall
processing was slow.

6
    At the time of events, Viriginia had lived in a retirement home in Kingsburg
7   for years and had become very close friends with Marsha Melvin, [Petitioner's]
wife. The two women habitually got together every Monday at the Melvin
8   residence to exercise while watching Richard Simmons tapes. [Petitioner] was
present and would help Virginia do the exercises.
9
    At some point in November 2004, [Petitioner] telephoned Virginia and
10  said he was coming over to fix her computer. He had helped her with her
computer in the past, and she had called him earlier and asked if he would
11  come, although she could not recall whether she asked him the same day as he
came over. Once at her apartment, [Petitioner] worked on the computer and
12  showed her some things she could do on it. He then asked if he could use the
bathroom. When he came out, he saw the mirror on the dresser in the bedroom
13  and said she could do her exercises there.[FN4] He suggested the two of them
could do exercises; Virginia said okay, as it was not unusual for them to do
14  exercises together, although they had done so at her apartment only a couple
of times before, and then in the living room.
15
FN4. When Virginia exercised with [Petitioner] and Mrs. Melvin at their home,
16  they used a mirror.

17      Virginia lay down on the bed and did some exercises, but then
[Petitioner], who was at the foot of the bed, pulled off her slacks and nylons.
18  Virginia said no and asked him what he was doing, but he just kept going. She
knew why he was doing it, but she "just froze" and could not do anything to stop
19  him.

20      [Petitioner] kissed Virginia on the cheek, then removed her panties and
said he had brought oil from home. He pushed up her bra and shirt, kissed her
21  breasts, and inserted a finger in her vagina. There was oil on his finger, and
some of the oil spilled on her bed. She told him no, but he did not stop. "If [she]
22  could have, [she] would have pushed him away and gotten him out of there
somehow." She was scared.
23
    When [Petitioner] stopped, he asked Virginia to move to the side of the
24  bed, close to the edge, and to lift and hold her legs. She did so, as she did not
know she could say no. She held her legs up in the air, whereupon he started
25  licking her vagina. Horrified, she told him no several times and asked what he
was going to tell his wife. He said not to tell Marsha; she would kill him.[FN5]
26

27  ————————————
[3]The factual background is taken from the opinion of the state appellate court and is presumed correct.
28  28 U.S.C. § 2254(e)(1).

U.S. District Court
E. D. California                                        -3-

FN5. On cross-examination, Virginia testified that, while she was doing an exercise, [Petitioner] had her remove her slacks and nylons, telling her she would be able to work better. Still later on cross-examination, she testified that her clothes were already off when she was doing the exercises. She then stated that after she got on the bed, [Petitioner] showed her some exercises, then removed the rest of her clothes, pushed up her shirt and bra, and used the oil with his finger. There was also testimony suggesting that at some point, Virginia put her clothes back on and went into the kitchen, but then returned to the bedroom when [Petitioner] asked why she had stopped trusting him. After she went into the bedroom the second time, "he was on [her.]." Virginia, who appeared to become quite confused during crossexamination, testified that she told the police everything she could remember.

As it was getting to the time Virginia had to go to lunch, [Petitioner] said it was lunchtime and stopped. She then asked him to trim her toenails, as she could not reach them and did not want them to rip her nylons when she got dressed. [Petitioner] cut her toenails for her, then he went home and Virginia went to eat. At lunch, she told a couple of the ladies who sat at her table what had happened. She told [Petitioner's] wife the next day. Although Virginia never contacted the police, she talked to them at her home a few days later, not long after she reported the events to her mother. Virginia did not contact the police on the day of the assault because Mrs. Melvin was a very close friend of hers, and she did not want to lose that friendship. Virginia denied having an affair with [Petitioner] or agreeing to any sexual contact with him, although she admitted they had tried to kiss on one previous occasion.

Kingsburg Police Officer Quiroz interviewed Virginia on November 13, 2004. Virginia, who appeared to be upset, said the incident had occurred three days earlier in her bedroom, and that she had not slept in there since it happened. Quiroz found a green sheet on the bed that had a large, circular, shiny spot on it. The spot and the whole room smelled like baby oil. During this interview, Quiroz asked whether [Petitioner] had threatened Virginia. She said no.

After the initial interview, Quiroz had Virginia come to the police department the next day for a second interview, which was videotaped.[FN6] In this interview, Virginia said she had not asked [Petitioner] to come and fix the computer that day. When he first set up her computer, he told her that he would have to come back because something would not connect, and he told her to call to remind him, but she never did. When he came over this time, he downloaded a computer program and then showed her how to do various things with it. He then asked to use her bathroom. Virginia related that she was in the living room, but then he called her in to where the mirror was and said she could watch herself when she did her exercises. She did some exercises, then walked into the kitchen to make coffee. He again called her in and said she could really see herself doing the exercises. He wanted her to do an exercise, and the next she knew, she was on the bed. Virginia related that [Petitioner] got on the bed. Thinking he was going to fall off, she grabbed, not with both arms around him, but so he could scoot over a little. Then he was kissing her before she knew what was going on, and just "at [her]" before she knew what was happening. He went down toward the end of the bed and was massaging her breast area. He had pushed up her bra and was kissing her nipples. She felt she could not leave. She did not know what to do. He then removed her slacks and rubbed her, then removed her nylons and said he could not feel the places he needed to rub. She was frozen with fear. When he pulled down her clothing, she thought

she would just pull her pants back on and leave. He told her no, that he did not want her dressed. She asked him what he was going to tell his wife. He said that if this got back to her, he would be in trouble. He pressed "extra hard" on Virginia after saying, "If this gets back to her."

FN6. A redacted videotape was played for the jury.

Virginia related that [Petitioner] said he had brought some baby oil, and he rubbed some on her. She told him no several times. He tried unsuccessfully to relax her and inserted his finger into her. At one point, he asked her to turn over and she did, but he spilled the baby oil. He then moved to the side of the bed and had Virginia lift her legs in the air and hold them with her hands. This was supposedly an exercise, but then started licking her genitals. When she raised her head, he told her to put her head down, that she did not need to see. After, he was going to dress her, but he noticed that her toenails needed clipping. When she said it was hard for her to clip them, he got onto the bed and clipped them for her. Then he finished dressing her and he left.

DEFENSE EVIDENCE

[Petitioner's] wife, Marsha Melvin, had known Virginia since high school, and they had been close friends since 1990. On November 10, 2004, Virginia related to Mrs. Melvin that she and [Petitioner] had been touching and kissing for a year. Virginia said that she had asked him to come over to fix her computer on November 9; he had done so, then they had gone into the bedroom and he had pulled down her clothes and rubbed her. She had told him no, then gotten up and gotten dressed. Mrs. Melvin suggested that she go over and hide in Virginia's closet, then Virginia could call [Petitioner] to come over and Mrs. Melvin could see what happened. Virginia did not want to do that.

Dr. Cole had been Virginia's physician for approximately six to eight years. Although he never tested Virginia's IQ, Cole opined that it and her ability to function in a cognitive way were probably normal.

(Lodged Doc. 1 at 2-6.)

### III.    DISCUSSION

#### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

1  **B.    Legal Standard of Review**

2       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

3  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

4  enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484,

5  1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus,

6  it is governed by its provisions.

7       Under AEDPA, an application for a writ of habeas corpus by a person in custody under

8  a judgment of a state court may be granted only for violations of the Constitution or laws of the

9  United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal

10  habeas corpus relief is available for any claim decided on the merits in state court proceedings

11  if the state court's adjudication of the claim:

12       (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established federal law, as
13       determined by the Supreme Court of the United States; or

14       (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
15       State court proceeding.

16  28 U.S.C. § 2254(d).

17       1.    Contrary to or an Unreasonable Application of Federal Law

18       A state court decision is "contrary to" federal law if it "applies a rule that contradicts

19  governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

20  materially indistinguishable from" a Supreme Court case, yet reaches a different result."

21  Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams, 529 U.S. at 405-06.  "AEDPA

22  does not require state and federal courts to wait for some nearly identical factual pattern

23  before a legal rule must be applied. . . . The statue recognizes . . . that even a general

24  standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930,

25  953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law"

26  requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v.

27  Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application

28  of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions

must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

## 2.    Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion,"does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or

merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions."  Id. at 787.  It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings."  Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do

1   not engage in a separate analysis applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d

2   911, 918, n. 7 (2002).  <u>Musalin v. Lamarque</u>, 555 F.3d at 834.

3   **IV.    REVIEW OF PETITION**

4       **A.    Claim One: Discriminatory Peremptory Challenges of Juror**

5       Petitioner claims the trial court erroneously denied his <u>Wheeler</u>/<u>Batson</u> motion for lack

6   of a prima facie case of discrimination as to the prosecution's peremptory challenge of

7   prospective juror T.B., a male African-American on the basis of race. (Pet. at 5.)

8           1.    <u>Relevant State Court Decision</u>

9       The claim was presented on direct appeal to the Fifth District Court of Appeal. (Lodged

10  Doc. 1.) The appellate court denied the claim in a reasoned decision, stating:

11          [Petitioner] challenges the trial court's denial of his <u>Batson</u>-<u>Wheeler</u>[FN7]
            motion, and its seating of a juror against whom the prosecutor exercised a
12          peremptory challenge.

13      FN7. <u>Batson v. Kentucky</u> (1986) 476 U.S. 79 (<u>Batson</u>); <u>People v. Wheeler</u>
        (1978) 22 Cal.3d 258 (<u>Wheeler</u>).
14

15          "The purpose of peremptory challenges is to allow a party to exclude
            prospective jurors who the party believes may be consciously or unconsciously
            biased against him or her. [Citation.]" (<u>People v. Jackson</u> (1992) 10 Cal.App.4th
16          13, 17-18.) Peremptory challenges may properly be used to remove jurors
            believed to entertain specific bias, i.e., bias regarding the particular case on trial
17          or the parties or witnesses thereto. (<u>Wheeler</u>, supra, 22 Cal.3d at p. 274.)
            However, "'[a] prosecutor's use of peremptory challenges to strike prospective
18          jurors on the basis of group bias – that is, bias against "members of an
            identifiable group distinguished on racial, religious, ethnic, or similar grounds"
19          – violates the right of a criminal defendant to trial by a jury drawn from a
            representative cross-section of the community under article I, section 16 of the
20          California Constitution. [Citations.] Such a practice also violates the defendant's
            right to equal protection under the Fourteenth Amendment to the United States
21          Constitution. [Citations.]' [Citation.]" (<u>People v. Bell</u> (2007) 40 Cal.4th 583, 596;
            see <u>Batson</u>, supra, 476 U.S. at p. 88; <u>Wheeler</u>, supra, 22 Cal.3d at pp.
22          276-277.)

23          "The United States Supreme Court has recently reaffirmed that <u>Batson</u>
            states the procedure and standard to be used by trial courts when motions
24          challenging peremptory strikes are made. 'First, the defendant must make out
            a prima facie case "by showing that the totality of the relevant facts gives rise to
25          an inference of discriminatory purpose." [Citations.] Second, once the defendant
            has made out a prima facie case, the "burden shifts to the State to explain
26          adequately the racial exclusion" by offering permissible race-neutral justifications
            for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the
27          trial court must then decide … whether the opponent of the strike has proved
            purposeful racial discrimination." [Citation.]' [Citation.]" (<u>People v. Avila</u> (2006)
28          38 Cal.4th 491, 541, quoting <u>Johnson v. California</u> (2005) 545 U.S. 162, 168.)

The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (<u>People v. Bell</u>, supra, 40 Cal.4th at p. 596; <u>Wheeler</u>, supra, 22 Cal.3d at pp. 280-282.) With these principles in mind, we turn to the individual motions.

A. Prospective Juror T.B.

When prospective juror T.B. was first called to the jury box, he answered a list of questions asked of all prospective jurors. He related that he had lived in Fresno for 25 years, owned a business, had a wife who was a bus driver, had two years of college, and spent his leisure time playing golf. He further related that he had served on a jury about 10 years earlier in a criminal case; the jury did not reach a verdict, and the experience was negative. T.B. further stated that he had no acquaintances in law enforcement and that no one close to him had been the victim of a crime. He subsequently called to the court's attention that he had not been able to see the witness list earlier, but in fact he had previously worked with one of the police officers on the list and "[p]ossibly" would be more inclined to believe that witness because of their past relationship.

The prosecutor subsequently turned to the subject of T.B.'s prior jury experience. This ensued:

"[MS. LANDAU, prosecutor:] If you don't mind my asking, Mr. [B.], what was negative about your jury experience, just the fact they didn't reach a verdict?

"[T.B.]: Yeah, just all of the – just what happened between closed doors in the jury room. All the arguing, and the bickering, and the people trying to change your mind even though you're steadfast in what you believe. Didn't shake me but shook some other people in the room. That was frustrating.

"MS. LANDAU: Do you mind if I ask what kind of case it was?

"[T.B.]: It was simply burglary. That was it. It was a burglary, house burglary."

Later, the prosecutor asked whether anyone had a problem with the rule that the testimony of one witness, if believed, was sufficient to prove a fact, and that neither corroboration, DNA, nor another eyewitness was necessary. When she remarked that she had to ask these kinds of questions "because of shows like CSI where they show bullets going through people's bodies," T.B. asked, "You can't do that?"

The prosecutor subsequently used a peremptory challenge to excuse T.B. Defense counsel immediately requested a side bar. Later, outside the presence of the prospective jurors, the trial court related that defense counsel had made a <u>Wheeler</u> motion, and the court asked counsel to place on the record what transpired.[FN8] This ensued:

FN8. Regardless of whether defense counsel specifically cited <u>Batson</u>, the issue was preserved for appeal. (<u>People v. Gray</u> (2005) 37 Cal.4th 168, 184, fn. 2.)

"MR. CRIEGO [defense counsel]: [T.B.] was by all appearances an African American. Since I'm an African American, it's been my

experience of the more than 100 jury trials I've done in Fresno County with the exception of one and only one, the District Attorney's Office routinely discharges African Americans from jury service when I am involved as the defense attorney. In this particular case Mr. [B.] had been passed over at least twice by the prosecutor, and today she issued the challenge by way of a peremptory excusing Mr. [B.] I believe he answered the questions fairly, no differently than anyone else. Although he said his prior jury service was a negative event in his life, I believe he said it was negative because of other individuals who could not make up their minds.

"THE COURT: Okay. Ms. Landau what's your response?

"MS. LANDAU: Your Honor, I will, if the Court is making a prima facie showing that?

"THE COURT: No. I find there's no prima facie showing made. But for the purposes of the record in the event I were to have ruled otherwise, do you want to state your reasons?

"MS. LANDAU: I will just briefly respond that regardless of what the office has done, this is about me specifically being accused of prosecutorial misconduct. I excused Mr. [B.] because he and I did have some interaction, and I felt that he was confrontational in that interaction. He indicated that he had a past jury experience that was negative for him because jurors were trying to talk other jurors out of things and not paying attention. I felt based on that he would have a hard time interacting with the rest of the jury in this case and that was basically the reason. I will also point out he was seated late yesterday, and I believe I exercised one peremptory challenge this morning before Mr. [B.] so."

"THE COURT: All right. I would find that in the event that people far wiser than I who have 90 days to mull it over were to disagree and find that there is a prima facie showing that the District Attorney has established a basis for the excuse . . . . And I can't make any comment about what the District Attorney's Office always does in other cases because I haven't been at or observed other cases."

[Petitioner] now says the trial court erred by failing to find a prima facie showing and, once the prosecutor gave her explanation, by failing to evaluate her reasons. We find no error.

"In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.'[FN9] [Citation.] The high court recently explained that 'a defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] 'An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them"' [Citation.]" (<u>People v. Gray</u>, supra, 37 Cal.4th at p. 186, <u>Johnson</u>, supra, 545 U.S. at pp. 168-170, fn.4.)

FN9. African-Americans are a cognizable group for purposes of <u>Batson</u> and <u>Wheeler</u>. (<u>People v. Alvarez</u> (1996) 14 Cal.4th 155, 193.) Although the record does not establish [Petitioner's] race, the probation officer's report suggests he is Caucasian. A defendant and prospective juror(s) alleged to have been wrongly excused need not be members of the same race in order for the defendant to complain. (<u>Powers v. Ohio</u> (1991) 499 U.S. 400, 416.)

"Though proof of a prima facie case may be made from any information in the record available to the trial court, the [California Supreme Court has] mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic – their membership in the group – and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' [Citations.]" (<u>People v. Bell</u>, supra, 40 Cal.4th at p. 597.)

"[W]hen a trial court denies a Wheeler motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling." (<u>People v. Howard</u> (1992) 1 Cal.4th 1132, 1155.) This standard of review is consistent with the United States Supreme Court's reiteration in Johnson of the applicable rules, "which require the defendant to attempt to demonstrate a prima facie case of discrimination based on the 'totality of the relevant facts.' [Citation.]" (<u>People v. Gray</u>, supra, 37 Cal.4th at p. 186; <u>see</u> <u>Johnson</u>, supra, 545 U.S. at p. 168.) "Because Wheeler motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.]" (<u>People v. Howard</u>, supra, 1 Cal.4th at p. 1155.)

The California Supreme Court has stated that a finding of no prima facie case will be affirmed "where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." (<u>People v. Farnam</u> (2002) 28 Cal.4th 107, 135; accord, <u>People v. Guerra</u> (2006) 37 Cal.4th 1067, 1101.) [Petitioner] argues this standard is outdated, since <u>Johnson</u> makes it clear that a party complaining of racial discrimination during voir dire makes a prima facie case of group bias if his or her allegations lead to the mere inference of discrimination. While we note that the California Supreme Court has employed the standard post-<u>Johnson</u> (<u>see</u> <u>People v. Guerra</u>, supra, 37 Cal.4th at p. 1101), we need not decide whether [Petitioner] is correct: "'[W]e have reviewed the record and, like the United States Supreme Court in <u>Johnson</u> . . . [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race.' [Citation.]" (<u>People v. Guerra</u>, supra, 37 Cal.4th at p. 1101.)

We find no such inference here. Although the establishment of a prima facie case does not depend on the number of prospective jurors challenged (<u>see</u> <u>People v. Moss</u> (1986) 188 Cal.App.3d 268, 277), the requisite showing is <u>not</u>

made merely by establishing the excused prospective juror was a member of a cognizable group (<u>People v. Alvarez</u>, supra, 14 Cal.4th at p. 198; <u>Untied States v. Chinchilla</u> (9th Cir. 1989) 874 F.2d 695, 698). While defense counsel asserted that the district attorney's office routinely challenged African-Americans in all but one jury trial in which defense counsel was involved, such a representation is insufficient because we have no way of knowing how many African-Americans were in the jury venires in those case, or how often and under what circumstances a prosecutor exercised peremptory challenges against them. (<u>See Swain v. Alabama</u> (1965) 380 U.S. 202, 224, overruled on other grounds in <u>Batson</u>, supra, 476 U.S. at p. 100, fn. 25; <u>People v. Bell</u>, supra, 40 Cal.4th at pp. 597-598 & fn. 2 [small absolute size of sample made drawing inference of discrimination, from prosecutor's excusal of two out of three African-American women, impossible].) Moreover, there was no showing that this particular prosecutor was involved in any of those cases. Additionally, while defense counsel suggested T.B. answered questions in the same manner as other prospective jurors, counsel recognized he had characterized his previous jury experience as negative. Regardless of why T.B. felt this way, his answers in this regard counter the notion that he was treated in a disparate manner that was suggestive of group bias. (<u>Compare</u> <u>People v. Hall</u> (1983) 35 Cal.3d 161, 168; <u>People v. Granillo</u> (1987) 197 Cal.App.3d 110, 121.) The prosecutor's voir dire of T.B. was not "desultory," but instead was similar to what she conducted with respect to the other prospective jurors. (<u>Compare</u> <u>People v. Turner</u> (1986) 42 Cal.3d 711, 727.)

Under the circumstances, [Petitioner] failed to produce evidence sufficient to permit the drawing of an inference that discrimination occurred.[FN10] (<u>Johnson</u>, supra, 545 U.S. at p. 170.) [Petitioner] says the trial court should have reconsidered its finding of no prima facie case once it determined Juror No. 55 had been improperly challenged (see post), but the California Supreme Court has held that "a trial court has no sua sponte duty to reexamine rulings on previous <u>Wheeler</u>/<u>Batson</u> motions once it determines that a prima facie case has been made as to one juror. [Citation.]" (<u>People v. Williams</u> (2006) 40 Cal.4th 287, 311; accord, <u>People v. Avila</u>, supra, 38 Cal.4th at pp. 548, 552.) [Petitioner] did not ask the trial court to revisit the challenge to T.B. after its ruling n Juror No. 55 (<u>see People v. Avila</u>, supra, at p. 552), "and we review whether the trial court's decision was correct at the time it was made and not in light of subsequent events." (<u>People v. Williams</u>, supra, at p. 311.)

FN10. In light of the trial court's express negative finding in this regard, we conclude the issue was not rendered moot by its asking the prosecutor to state her reasons. (<u>Compare Hernandez v. New York</u> (1991) 500 U.S. 352, 359 (plur. Opn. of Kennedy, J.) [where prosecutor justified challenges although no express finding of a prima face case had been made, issue whether prima facie case of discrimination had been made became moot] with <u>People v. Turner</u> (1994) 8 Cal.4th 137, 166-167, overruled on other grounds in <u>People v. Griffin</u> (2004) 33 Cal.4th 536, 555, fn. 5 [issue not moot where trial court ruled it did not find prima facie case and only asked prosecutor for justifications to complete record in case appellate court disagreed]; <u>see People v. Jurado</u> (2006) 38 Cal.4th 72, 102, 104 [when trial court solicits explanation without first indicating its views on prima facie issue, reviewing court may infer implied prima facie finding]; <u>People v. Arias</u> (1996) 13 Cal.4th 92, 135 [same].)

Given our conclusion no prima facie case was established, we need not review the adequacy of the prosecutor's justification for her peremptory challenge of T.B. (<u>People v. Farnam</u>, supra, 28 Cal.4th at p. 135; <u>People v.</u>

<u>Turner</u>, supra, 8 Cal.4th at p. 167.) Nevertheless, we have done so and conclude the trial court did not err in its assessment of them.

As previously described, and assuming, out of abundance of caution, that [Petitioner] made out a prima facie case of racial discrimination here – step one under <u>Batson</u> and <u>Wheeler</u> – "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two) . . . . The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' [Citations.]" (<u>Purkett v. Elem</u> (1995) 514 U.S. 765, 767-768.)

Because the prosecutor's explanation here was race-neutral and, hence, facially valid, we move to step three of the process, at which point the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. (<u>Purkett v. Elem</u>, supra, 514 U.S. at p. 767.) It is at this point that the persuasiveness of the justification becomes relevant (<u>Johnson</u>, supra, 545 U.S. at p. 171), as implausible or fantastic justifications will often be found to be pretexts for purposeful discrimination (<u>Purkett v. Elem</u>, supra, at p. 768). Once the prosecutor "come[s] forward with an explanation that demonstrates a neutral explanation related to the particular case tried" (<u>People v. Johnson</u> (1989) 47 Cal.3d 1194, 1216), the trial court must then satisfy itself that the explanation is genuine (<u>People v. Hall</u>, supra, 35 Cal.3d at p. 167). "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of the trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (<u>Id</u>. at pp. 167-168.) "When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (<u>People v. Jurado</u>, supra, 38 Cal.4th at pp. 104-105.)

A prosecutor is presumed to use his or her peremptory challenges in a constitutional manner. (<u>People v. Alvarez</u>, supra, 14 Cal.4th at p. 193; <u>Wheeler</u>, supra, 22 Cl.3d at p. 278.) The justification proffered for the particular excusal "need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citation.]" (<u>People v. Arias</u>, supra, 13 Cal.4th at p. 136.) "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory. '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]' [Citation.]" (<u>People v. Reynoso</u> (2003) 31 Cal.4th 903, 924, quoting <u>Purkett v. Elem</u>, surpa, 514 U.S. at p. 769.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (<u>People v. Silva</u> (2001) 25 Cal.4th 345, 386.)

[Petitioner] contends the record does not support the prosecutor's explanation that T.B. was "confrontational" in his interaction with her. The trial

1     court, having observed that interaction, was in a much better position to judge T.B.'s demeanor, and thus the prosecutor's credibility, than we who are limited to "'the cold record.'" (People v. Reynoso, supra, 31 Cal.4th at pp. 917-918 & fn.4; see People v. Ward (2005) 36 Cal.4th 186, 200.) Significantly, the transcript of voir dire does not contradict the reason given by the prosecutor. (See People v. Reynoso, supra, at p. 923.) Moreover, T.B. appeared to be frustrated over his prior jury's inability to reach a verdict on what he seemed to view as a simple case, and, in light of his comments, the prosecutor rightfully could feel concerned about his ability to interact with the rest of the jury. (See People v. Gutierrez (2002) 28 Cal.4th 1083, 1125.) As the trial court knew, there had already been one hung jury in this case, giving added impetus to the prosecutor's concern in this regard. In light of the foregoing, the trial court adequately assessed the prosecutor's explanation, and substantial evidence supports its implicit conclusion the explanation was genuine.

(Lodged Doc. at 6-16.)

Petitioner then filed for review with the California Supreme Court which was summarily denied. (Lodged Doc. 2.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the courts below. Ylst, 501 U.S. at 803.

2.    Analysis

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., quoting Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the

1  trial judge's findings in the context under consideration here largely turn on evaluation of

2  credibility, a reviewing court ordinarily should give those findings great deference." <u>Batson</u>, 476

3  U.S. at 98, n.21.

4      In this case, the state court's determination that under <u>Batson</u> there was no racial

5  pretext in the prosecution's exercise of a peremptory strike to Prospective Juror T.B., an

6  African-American male was not unreasonable. Petitioner challenges the prosecution's

7  peremptory strike as to one African-American juror.[4] At trial, the court denied the objection

8  stating that Petitioner did not meet his burden to show that the peremptory strike created an

9  inference of discrimination without reasoning. (Lodged Doc. 1 at 9.) On appeal, the state court

10  found that in viewing the totality of the relevant circumstances, that there was not an inference

11  of bias. First, the court of appeal found that defense counsel's assertion that the Fresno

12  County District Attorney's office routinely challenged African-American jurors in all the cases

13  he was involved was not sufficient to establish an inference of discrimination, as he presented

14  no evidence of the number of African-American jurors challenged in his past cases, or that the

15  prosecutor was involved in those cases. Further, the court recognized that the juror did make

16  comments regarding his negative experience during his prior jury service. <u>Id.</u> In light of the lack

17  of evidence regarding the number of African-American jurors challenged, and the juror's

18  negative comments to questions similar to those posed to other prospective jurors, the state

19  court found that there was no inference of bias with regard to the prosecutor's challenge to the

20  juror. <u>Id.</u>

21      At the first step of the <u>Batson</u> analysis, Petitioner must make out a prima facie case

22  "by showing that the totality of the relevant facts gives rise to an inference of discriminatory

23  purpose." <u>Johnson v. California</u>, 545 U.S. 162, 168 (2005) (footnote omitted). In order to

24  establish a prima facie case of racial discrimination, a petitioner must show that "(1) the

25  prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

26  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

27  _____

28      [4] Later, as discussed in Petitioner's second claim, Petitioner challenges the trial court's action in retaining a second African-American juror that the prosecution attempted to remove by way of peremptory challenge.

inference that the strike was motived by race." <u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (9th Cir. 2006) (citing <u>Batson</u>, 476 U.S. at 96, and <u>Cooperwood v. Cambra</u>, 245 F.3d 1042, 1045-46 (9th Cir. 2001)). A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" <u>Johnson v. California</u>, 545 U.S. at 169 (quoting <u>Batson</u>, 476 U.S. at 94.)[5] In evaluating whether a petitioner has established a prima facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." <u>Boyd</u>, 467 F.3d 1146 (quoting <u>Batson</u>, 476 U.S. at 94, 96). The Petitioner's burden at the first <u>Batson</u> step is "not an onerous burden." <u>Crittenden v. Ayers</u>, 624 F.3d 943, 955 (9th Cir. 2010). As the Supreme Court clarified in <u>Johnson v. California</u>, 545 U.S. at 170:

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge — on the basis of all the facts, some of which are impossible for the defendant to know with certainty — that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

In this case, Petitioner objected to the peremptory strike as racially motivated based, in part, on T.B.'s membership in a cognizable racial group. A peremptory strike of an prospective juror of a cognizable racial group does not, by itself, support an inference that discrimination occurred, <u>see</u> <u>United States v. Vasquez-Lopez</u>, 22 F.3d 900, 902 (9th Cir. 1994), but it is afforded weight in combination with the other factors offered by defense counsel.

Here, Petitioner has provided little information upon which to determine if there was a prima facie inference of discrimination. <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1399 (2011) (In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was

---

[5] In <u>Batson</u>, defense counsel timely objected to the prosecutor's use of peremptory challenges because they resulted in striking "all black persons on the venire." <u>Id.</u>, 476 U.S. at 100. The Supreme Court held that this was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly rejected the objection without requiring the prosecutor to give an explanation for his action." <u>Id.</u>

1   before the state court that adjudicated the claim on the merits."). At the time of the premptory

2   challenge, no information was provided regarding the number of African-American jurors in

3   the jury pool, and the number of African-American jurors challenged, if any. "[C]omparative

4   juror analysis may be employed at step one to determine whether the petitioner has

5   established a prima facie case of discrimination." Crittenden, 624 F.3d at 956. However, none

6   was provided here. As the challenge is only to one juror, without a sufficient record, it is

7   difficult to determine if a prima facie case of discrimination occurred. It is noted that striking

8   a single juror can be sufficient to show an inference of discrimination:

> We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose. But just as "one" is not a magic number which establishes the absence of discrimination, the fact that the juror was the one Black member of the venire does not, in itself, raise an inference of discrimination. Using peremptory challenges to strike Blacks does not end the inquiry; it is not per se unconstitutional, without more, to strike one or more Blacks from the jury. A district court must consider the relevant circumstances surrounding a peremptory challenge.

United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994) (citations omitted). However, the purported reasons for dismissing the juror, namely his prior negative jury experience, does not infer discriminatory intent.

On direct review, the trial court's determination regarding the prosecutor's proffered reasons is entitled to "great deference," Batson, 476 U.S., at 98, n. 21, and "must be sustained unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477 (2008). On federal habeas review, "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011), quoting, Renico v. Lett, 130 S.Ct. 1855, 1862 (2010). In this case, the state appellate court decision, in light of the relative dearth of evidence, was not unreasonable. The determination that Petitioner did not make a prima facie showing of an inference of discrimination was not erroneous.

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The claim should be denied.

**B.    Claim Two: Reseating of a Juror Challenged by the Prosecution**

Petitioner argues that the trial court erred in reseating Juror No. 55 after the prosecutor's challenge to the juror was denied. (Pet. at 4, 6.)

1.    Relevant State Court Decision

The claim was presented on direct appeal to the Fifth District Court of Appeal. (Lodged Doc. 1.) The appellate court denied the claim in a reasoned decision, stating:

Juror No. 55

The woman who ultimately became Juror No. 55 was called into the box after the defense had exhausted its peremptory challenges. In answering the set list of questions, Juror No. 55 revealed that she had lived in Fresno for 35 years, was an EKG technician, had a husband who was a captain with the Fresno Police Department, had graduated from high school and had three years of college, and had no prior jury service. During the prosecutor's voir dire, this exchange took place:

"[MS. LANDAU]: Any problem with the idea that we give testimonial evidence equal weight to sort of scientific or physical evidence in a trial. Is there anyone here who feels we should never prosecute a case where there's not physical evidence such as DNA, fingerprints, blood. [¶] Can you conceive of a situation where there wouldn't be DNA or physical evidence, [Juror No. 55], in a case?

"[JUROR NO. 55]: No. I would rather have proof.

"MS. LANDAU: Do you think that physical evidence is always left behind at a crime scene?

"[JUROR NO. 55]: No.

"MS. LANDAU: So I'll just use as an example, I had a drug possession case where they wanted DNA on the baggie of meth it happened to be. Can you understand there's not always DNA left on things? There's not always physical evidence left, like fingerprints sometimes when people commit a crime.

"[JUROR NO. 55]: That's true.

"MS. LANDAU: Can you agree with that in general?

"[JUROR NO. 55]: Yes.

"MS. LANDAU: If you hear testimonial evidence, I'll direct this at you [Juror No. 55] –

"MR. CRIEGO: Objection to the form of the question,

presupposing evidence.

"THE COURT: That's sustained.

"MS. LANDAU: Could you give equal weight to testimonial evidence that you would give to physical evidence?

"[JUROR NO. 55]: No.

"MS. LANDAU: Okay. So in other words, are you saying that without physical evidence, you don't think you could arrive at a verdict in this case?

"[JUROR NO. 55]: Correct.

"MR. CRIEGO: Same objection. She's having the juror presuppose the evidence.

"THE COURT: That's sustained.

"MS. LANDAU: You're going to be instructed in this case that direct and – testimonial and physical evidence are given equal weight. Do you think you could follow that instruction?

"[JUROR NO. 55]: Yes, I can."

The prosecutor exercised her next peremptory challenge against Juror No. 55. After an unreported conversation between the court and counsel, the court asked the woman to remain as a juror and directed the prosecutor to exercise her next peremptory challenge. When the prosecutor passed, the court announced there was a completed jury and proceeded to selection of the alternates. Juror No. 55 was subsequently sworn in as one of the trial jurors. After the jury left the courtroom, the situation involving Juror No. 55 was addressed:

"[THE COURT:] As to [Juror No. 55], . . ., she is, the record should show she is African American. Because we had the Wheeler issue come up earlier with Mr. [B.], I ruled that at that point there hadn't been a prima facie showing. One thing, there had been no systematic exclusion or pattern of exclusion based upon race. In this case, I realize that Ms. Landau in just a moment will state the reasons she had to excuse, but I did not see that there was – well, to be honest with you, I was not quite sure what the procedure is when this kind of things happens. [¶] Ms. Landau, you may make the record in this case.

"MS. LANDAU: Again, I'm going to ask that the Court determine whether or not there's been a prima facie showing.

"THE COURT: I think there has at this point of there being no apparent reason [Juror No.55] should be excused, she being the second and only other African American person on the entire panel of 70 that we originally had. Now you may go ahead and make your record.

"MS. LANDAU: Um, for the record, Your Honor, I did ask some questions about regarding physical evidence and testimonial evidence wherein I thought she gave an answer that she would require more than testimonial evidence in the case, and I was concerned about that. I will also state for the record that during the times that I was asking questions of all the panelists, she was either non-responsive, or looked puzzled, or like she didn't agree with what I was saying. So those were my concerns. They had nothing to do with race whatsoever. A juror of any other race who had responded to my question the way that she did I would have had the same concerns.

"THE COURT: The record has been made. I rule insufficient evidence to justify the excusal, and she'll remain on the jury . . ..

"MS. LANDAU: Just for the record, I would like to challenge the jury at this point. My concern now is that I exercised a peremptory on a juror, and I don't know if she's going to take personal offense to that.

"THE COURT: I don't know what else to do. Otherwise I'd have to throw out the whole jury and start again.

"MS. LANDAU: That's the motion I'm making.

"THE COURT: That's denied."

[Petitioner] contends the trial court erred in reseating Juror No. 55, as it neither obtained defense counsel's consent to that procedure nor gave him a meaningful opportunity to object to that remedy.

As a preliminary matter, respondent suggests there is no justiciable issue, either because it is moot or because [Petitioner] lacks standing. During the evidentiary portion of trial, the trial court related that the prosecutor "was concerned that because of my rulings that I was making at least an implied finding that she was dishonest or racially motivated or in some other way improper in her conduct. And I assured her that I certainly did not intend to – for that to be the state of the record. She has done nothing improper or deceitful or racially inappropriate. And, in fact, I would state this point, if any mistake was made, it was my mistake."

We are not quite sure what to make of this statement. Respondent argues it shows the People, not [Petitioner], were the aggrieved party; hence, [Petitioner] has no right to challenge the reseating of Juror No. 55 because the Wheeler remedy of dismissing the jurors and quashing the venire only applies where a party is shown to have improperly exercised peremptory challenges to exclude members of a cognizable group, and here the trial court did not find purposeful racial discrimination. The trial court did find a prima facie case of improper group discrimination, however, and once that finding was made, it could not be undone. (People v. Arias, supra, 13 Cal.4th at p. 135; People v. Granillo, supra, 197 Cal.App.3d at p. 122.) Under the circumstances, the trial court's subsequent finding of "insufficient evidence to justify the excusal" cannot reasonably be read as anything but a rejection of the prosecutor's assertion of a nondiscriminatory purpose, since even a trivial race- or group-neutral explanation, if genuine, will support the exercise of a peremptory challenge for

which, otherwise, no reason at all need be given. (See Code Civ. Proc., § 226, subd. (b);[FN11] People v. Ervin (2000) 22 Cal.4th 48, 74-75.) Accordingly, we address the merits of [Petitioner's] claim.

FN11. Code of Civil Procedure section 226, subdivision (b), provides: "A challenge to an individual juror may be taken orally or may be made in writing, but no reason need be given for a peremptory challenge, and the court shall exclude any juror challenged peremptorily." The provisions of this statute apply to criminal, as well as civil, trials. (Code Civ. Proc., § 192.)

We begin by noting that the question whether a prima facie case was shown is a close one, and the question whether substantial evidence supports the trial court's finding of an improper peremptory challenge is even closer. Assuming the trial court, having observed Juror No. 55, disagreed with the prosecutor's assertion that the juror was unresponsive or appeared to be puzzled or not in agreement with what the prosecutor was saying, the record seems clearly to support the prosecutor's concerns about the juror's weighing of testimonial evidence. In any event, we need not determine whether the trial court's ruling in this regard should be set aside (see People v. Huggins (2006) 38 Cal.4th 175, 228, fn. 13), since we are persuaded [Petitioner] implicitly consented to the reseating of the juror.

As a general rule, once a peremptory challenge is exercised, the trial court is required to excuse the challenged prospective juror. (Code Civ. Proc., § 226, subd. (b).) Originally, the only option recognized for a Wheeler violation was to begin jury selection anew. (Wheeler, supra, 22 Cal.3d at p. 282; People v. Rodriguez (1996) 50 Cal.App.4th 1013, 1025.) As the California Supreme Court stated in Wheeler, "If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining part is entitled to a random draw from an entire venire – not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." (Wheeler, supra, at p. 282, fn. omitted.)

In People v. Willis (2002) 27 Cal.4th 811, however, the California Supreme Court dealt with a situation in which defense counsel, representing an African-American defendant, first moved to dismiss and replace the entire jury venire as underrepresentative of African-Americans, and, when unsuccessful, apparently attempted to solve the problem by using his peremptory challenges to exclude Caucasian males from the jury in violation of the People's right to an impartial jury. The trial court, after soliciting defense counsel's reasons for his peremptory challenges, found counsel had exercised discriminatory challenges due to group bias. With the People's assent, the court rejected a defense motion to dismiss the remaining venire, and continued voir dire with the original venire. (Id. at pp. 813-814.)

On appeal from his conviction, the defendant argued that dismissal of the venire was the only available remedy for his own exercise of group bias. (Willis, supra, 27 Cal.4th at p. 814.) After observing that the Wheeler remedy of dismissal is not compelled by the federal constitution (Willis, supra, at p. 818; see Batson, supra, 476 U.S. at p. 99, fn.24), the California Supreme Court

concluded that "the benefits of discretionary alternatives to mistrial and dismissal of the remaining jury venire outweigh any possible drawbacks. As the present case demonstrates, situations can arise in which the remedy of mistrial and dismissal of the venire accomplish nothing more than to reward improper voir dire challenges and postpone trial. Under such circumstances, and with the assent of the complaining party, the trial court should have the discretion to issue appropriate orders short of outright dismissal of the remaining jury, including . . . reseating any improperly discharged jurors if they are available to serve." (Willis, supra, at p. 821.) Finding it "appropriate, and consistent with the ends of justice, to permit the complaining party to waive the usual remedy of outright dismissal of the remaining venire" (Id. at p. 823), the court nevertheless "stress[ed] that such waiver of consent is a prerequisite to the use of such alternative remedies or sanctions, for Wheeler made clear that 'the complaining party is entitled to a random draw form an entire venire' and that dismissal of the remaining venire is the appropriate remedy for a violation of that right. [Citation.] Thus, trial courts lack discretion to impose alternative procedures in the absence of consent or waiver by the complaining party. On the other hand, if the complaining party does effectively waive its right to mistrial, preferring to take its chances with the remaining venire, ordinarily the court should honor that waiver rather than dismiss the venire and subject the parties to additional delay." (Willis, supra, at pp. 823-824.)

In People v. Overby (2004) 124 Cal.App.4th 1237 (Overby), the prosecutor exercised a peremptory challenge to excuse an African-American juror. Defense counsel immediately asked the court to order the prospective juror to remain in the courtroom, then made a Batson-Wheeler motion. Counsel did not request any specific remedy for the alleged violation. After a sidebar hearing, the trial court granted the motion and elected the remedy of reseating the improperly challenged juror. When asked if they wished to be heard concerning the court's decision, defense counsel submitted the matter and the prosecutor objected. When the challenged juror was reseated and voir dire resumed, the prosecutor made a Batson-Wheeler motion that was denied. She later requested reconsideration and argued that the venire should be dismissed. At no time did defense counsel state agreement with the notion that the venire should be dismissed or express dissatisfaction with the remedy chosen by the court. The motion for reconsideration was denied, and the defendant ultimately was convicted. (Overby, supra, at pp. 1242-1243.)

On appeal, Overby claimed he neither consented to the trial court's proposed remedy nor waived his right to dismissal of the panel. He argued that he should receive a new trial because of the trial court's failure to dismiss the entire venire in the absence of his consent. The Attorney General countered that Overby's conduct amounted to implied consent to the reseating of the challenged juror. (Overby, supra, 124 Cal.App.4t at p. 1243.) In agreeing, the Court of Appeal noted that, while the Supreme Court in Willis did not specify what constitutes consent to an alternate remedy or effective waiver of the right to a mistrial, such consent need not be personally given, and the right to request a mistrial need not be personally waived, by the defendant. (Overby, supra, at pp. 1242-1243.) The Court of Appeal rejected Overby's argument that defense counsel did not consent, expressly or implicitly, to the reseating of the juror, but instead merely remained silent, and that consent or waiver may not be implied from silence. Instead, the court found that the "rationale for declining to imply consent or waiver from silence is not applicable in the Batson-Wheeler context, where litigants waive their objections to the improper use of peremptory challenges if they do not assert them in a timely manner. [Citation.]" (Overby,

supra, at p. 1244.) The court further found that, by immediately asking the trial court to prevent the challenged juror from leaving the courtroom and declining the opportunity to advocate any particular remedy, counsel's conduct was not mere silence, but instead was an indication of consent to the remedy proposed by the trial court. This conclusion was reinforced by defense counsel's failure to state a preference for a new panel when the prosecutor sought reconsideration. (Id. at pp. 1244-1245.)

[Petitioner] acknowledges the holdings in Willis and Overby, but contends the notions of implicit consent or waiver cannot be applied to him because, in light of the trial court's denial of the prosecutor's challenge to the jury, any further objection would have been futile. We disagree. The defense's perspective clearly would have been different from that of the prosecution, especially where the prosecutor's only stated concern was that the juror might take offense to having been challenged. [Petitioner], on the other hand, was entitled under Wheeler to dismissal of the jurors, discharge of the venire, and new jury selection if he so desired. (Wheeler, supra, 22 Cal.3d at p. 282, see Willis, supra, 27 Cal.4th at p. 823.) We will not assume the trial court would have refused that course of action had [Petitioner] requested it. If defense counsel was dissatisfied with the trial court's selected remedy, he should have said something. As he did not, [Petitioner's] challenge to the reseating of Juror No. 55 fails.

(Lodged Doc. 1 at 16 -24.)

Petitioner then filed for review with the California Supreme Court which was summarily denied. (Lodged Doc. 2.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the courts below. Ylst, 501 U.S. at 803.

2.     Analysis

The state court of appeal held that the trial court found a prima facie case of improper discrimination as to Juror 55. (Lodged Doc. 1 at 19 ("The trial court did find a prima facie case of improper group discrimination, however, and once that finding was made, it could not be undone".)) However, the state court of appeal stated that reseating of the improperly challenged juror with the consent of the complaining party was a proper remedy. (Lodged Doc. 1 at 21 (citing People v. Willis, 27 Cal.4th 811, 818 (2007).)

Petitioner's procedural claim lacks merit as Supreme Court has left it to the states to come up with their own procedures for implementing Batson. In Batson, the Court stated:

Nor are we persuaded by the State's suggestion that our holding will create serious administrative difficulties. In those States applying. a version of the evidentiary standard we recognize today, courts have not experienced serious administrative burdens, . . . and the peremptory challenge system has survived. We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges. FN 24.

1

2

3

4

5

> FN 24: In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire.

6  Batson, 476 U.S. at 99-100 & n.24. (Citations and internal formatting omitted.)

7       Two decades later, the Supreme Court continues to recognize that States can use

8  different procedures to implement Batson, so long as the right standards from Batson are

9  applied. See Johnson v. California, 545 U.S. 162, 168 (2005) ("Although we recognize that

10 States do have flexibility in formulating appropriate procedures to comply with Batson, we

11 conclude that California's 'more likely than not' standard is an inappropriate yardstick by which

12 to measure the sufficiency of a prima facie case."); cf. Ford v. Georgia, 498 U.S. 411, 423

13 (1991) (noting that the Court had recognized in Batson "that local practices would indicate the

14 proper deadlines in the context of the various procedures used to try criminal cases, and [the

15 Court] left it to the trial courts, with their wide 'variety of jury selection practices,' to implement

16 Batson in the first instance.") In short, the Supreme Court has never decided that reseating

17 a challenged juror violates Batson. See Ayala v. Wong, 2012 U.S. App. LEXIS 18321, 81-82

18 (9th Cir. Cal. Aug. 29, 2012) (Callahan, J., dissenting) ("The [Supreme] Court reiterated that

19 '[i]n light of the variety of jury selection practices followed in our state and federal trial courts,

20 we make no attempt to instruct these courts how best to implement our holding today.' Id. at

21 99 n.24. As a result, during the quarter of a century that has passed since Batson, courts have

22 considered numerous ways of applying Batson's three-step standard.") Given the present state

23 of Baston and its progeny, the state appellate court's rejection of Petitioner's claim cannot be

24 said to be contrary to or an unreasonable application of, clearly established Supreme Court

25 authority, as it must be to justify habeas relief under § 2254(d).

26       Second, the state court of appeal's finding, that Petitioner's silence amounted to

27 consent of the remedy under the circumstances, was reasonable. Here, the prosecution

28 moved the court to discharge the venire and select a new jury based on the concern that Juror

1    55 would take offense to the prosecution's attempt to remove her. Petitioner did not challenge

2    the action of the Court. Moreover, Petitioner was not the party to challenge the juror in

3    question. The claim should be denied.

4    **C.      Claim Three: Sufficiency of the Evidence**

5        Petitioner claims that the evidence was insufficient to show the sexual penetration and

6    oral copulation were accomplished by force. (Pet. at 7-8.)

7            1.      Relevant State Court Decision

8        The claim was presented on direct appeal to the Fifth District Court of Appeal. (Lodged

9    Doc. 1.) The appellate court denied the claim in a reasoned decision, stating:

> [Petitioner] contends his convictions must be reversed, or at least
> modified to reflect conviction of a lesser included offense, because the evidence
> is insufficient to establish that he used any force to overcome Virginia's will. In
> this respect, the verdict forms stated that the jury found [Petitioner] guilty of
> sexual penetration by force and forcible oral copulation, as charged in counts 1
> and 2 of the first amended information, respectively. The first amended
> information alleged that each offense was accomplished "by force, violence,
> duress, menace, and fear of immediate and unlawful bodily injury . . . ." Jurors
> were instructed, as to both counts, solely on theories of force and duress.
> Accordingly, we must determine whether the evidence sufficiently established
> [Petitioner's] use of force or duress to accomplish the charged acts. (See In re
> Jose P. (2005) 131 Cal.App.4th 110, 116, fn. 4.)
>
> Section 288a, subdivision (c)(2) and 289, subdivision (a)(1) prohibit
> commission of an act of oral copulation and an act of sexual penetration,
> respectively, when said act "is accomplished against the victim's will by means
> of," inter alia, force or duress. The term "force" has the same meaning in these
> statutes as it does in section 261, subdivision (a)(2), which defines forcible rape.
> (People v. Kusumoto (1985) 169 Cal.App.3d 487, 493.) So does the term
> "duress," except that a threat of hardship does not constitute duress for
> purposes of the rape statute. (See § 261, subd. (b); People v. Leal (2004) 33
> Cal.4th 999, 1001-1002, 1004; People v. Pitmon (1985) 170 Cal.App.3d 38,
> 50.)[FN12]
>
> FN12. [Petitioner's] jury was instructed, as to each offense, that "'[d]uress'
> means a direct or implied threat of force, violence, danger, hardship or
> retribution sufficient to coerce a reasonable person of ordinary susceptibilities
> to perform an act which she would otherwise not have performed, or acquiesce
> in an act to which she otherwise would not have submitted."
>
> In People v. Griffin (2004) 33 Cal.4th 1015, the California Supreme Court
> held that "the Legislature did not intend the term 'force,' as used in the rape
> statute, to be given any specialized legal definition." (Id. at p. 1023.) The court
> found nothing "in the common usage definitions of the term 'force,' or in the
> express statutory language of section 261 itself, that suggests force in a forcible
> rape prosecution actually means force 'substantially different from or
> substantially greater than' the physical force normally inherent in an act of

consensual sexual intercourse. To the contrary, it has long been recognized that 'in order to establish force within the meaning of section 261, subdivision (a)(2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim.'" (Griffin, at pp. 1023-1024.) Thus, ""force" plays merely a supporting evidentiary role ...." (Id. at p. 1025.) The court observed that "[t]he element of force in forcible rape does not serve to differentiate between two forms of unlawful sexual contact as it does under section 288 [, proscribing, in separate subdivisions, nonforcible and forcible lewd acts against children]. When two adults engage in consensual sexual intercourse, whether with or without physical force greater than that normally required to accomplish an act of sexual intercourse, the forcible rape statute is not implicated. The gravamen of the crime of forcible rape is a sexual penetration accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. ... [In] a forcible rape prosecution the jury determines whether the use of force served to overcome the will or the victim to thwart or resist the attack, not whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. The Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction. Nor has the rape law ever sought to quantify the amount of force necessary to establish the crime of forcible rape... [¶] The question for the jury in this case was simply whether defendant used force to accomplish intercourse with [the victim] against her will, not whether the force he used overcame [the victim's] physical strength or ability to resist him." (Griffin, at pp. 1027-1028.)

In People v. Guido (2005) 125 Cal.App.4th 566, 576, the Court of Appeal held that the foregoing concepts "apply equally to the crime of forcible oral copulation. Consensual oral copulation, with or without physical force greater than that normally required to accomplish the act, is not unlawful except when accomplished under circumstances violative of section 288a. As with forcible rape, the gravamen of the crime of forcible oral copulation is a sexual act accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. As with forcible rape, it is only when one participant in the act uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful." We see no reason why these principles should not also apply to the crime of forcible sexual penetration in violation of section 289.

We review the evidence presented at trial in light of the applicable principles concerning force and duress. The standard of review is clear. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 578; accord, Jackson v. Virginia (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (People v. Johnson, supra, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (People v. Reilly (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (People v. Culver (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these

1

are functions reserved for the trier of fact (In re Frederick G. (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence." (People v. Meza (1995) 38 Cal.App.4th 1741, 1747; accord, People v. Redmond (1969) 71 Cal.2d 745, 755.)

Virginia testified that she "just froze," and she told police she was frozen with fear. Her lack of physical reaction does not necessarily suggest she consented or [Petitioner] did not overcome her will by means of force of duress. (See People v. Barnes (1986) 42 Cal.3d 284, 299-300.) Indeed, Virginia's testimony made it clear that she did not consent to the sexual activity, and that she verbally conveyed this fact to [Petitioner] several times by telling him "no," but he refused to stop. Although lack of consent and force or duress are separate elements that must each be proven (In re Jose P., supra, 131 Cal.App.4th at p. 116), the same evidence is often relevant to both, as it is directly linked to the overbearing of the victim's will (People v. Maury (2003) 30 Cal.4th 342, 403). In addition to Virginia's verbal expressions to [Petitioner] that his acts were against her will, she testified that when [Petitioner] inserted his finger in her vagina, it did not feel good; if she could have, she would have pushed him away and gotten him out of there somehow. She also testified that, after she went into the bedroom, "he was on me." Her statement to police was admitted into evidence; in it, she related that [Petitioner] was kissing her before she knew what was going on; "He was just at me before I know [sic] what was happening…." She also told the police that when she asked him what he was going to tell his wife, he responded (as she described it), "If this gets back to her, he pressed extra hard on me then, I'm in trouble." She also related to police that when he stopped kissing her and pulled "everything" down, she thought she would just pull her pants back on and leave, but he said no, that he did not want her dressed, "[s]o, my clothes came off."

We are persuaded that, considering the evidence in light of all the circumstances, a rational trier of fact could have found that [Petitioner] used force or duress to accomplish the charged acts with Virginia against her will. In particular, his statement that [Petitioner] pressed "extra hard" suggests he was already pressing on her and, in context, conveying an implied threat of worse. The evidence is sufficient to uphold the convictions. (See In re Jose P., supra, 131 Cal.App.4th at pp. 116-118.)

(Lodged Doc. 1 at 24-28.)

Petitioner then filed for review with the California Supreme Court which was summarily denied. (Lodged Doc. 2.) The California Supreme Court is presumed to have denied the claim for the same reasons stated in the courts below.  Ylst, 501 U.S. at 803.

        2.    Analysis

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements

of the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). <u>Jackson</u> established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. <u>United States v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. <u>Id.</u>, citing <u>Jackson</u>, 443 U.S. at 319. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" <u>Id.</u>, quoting <u>Jackson</u>, 443 U.S. at 326, 99 S.Ct. 2781.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u>, quoting <u>Jackson</u>, 443 U.S. at 319 (emphasis in original). "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." <u>Id.</u>

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir. 2005); <u>see also</u> <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011) ("Thus, when we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted.")

Here, the state court of appeal reasonably applied the <u>Jackson</u> standard. The state court noted that the question was whether Petitioner used force or duress to accomplish the sexual acts with the victim against her will – not whether the force he used overcame Virginia's

physical strength or ability to resist him. (Lodged Doc. 1 at 25-26.) The state court of appeal conducted a thorough review of the evidence and found sufficient evidence to support the finding that Petitioner did use force or duress to accomplish the sexual acts with the victim against her will. In particular, the state court of appeal found that the victim's lack of physical reaction to attempt to make Petitioner stop did not necessarily suggest that the victim consented or that petitioner did not overcome her will by means of force or duress. (Lodged Doc. 1 at 28.) Further, the state court found that a rational juror could find that Petitioner conveyed an implied threat when he "pressed extra hard on her" in response to her question what he was going to tell his wife. (Id.) Based on the above facts, the state court found sufficient evidence to support the conviction.

This Court agrees. Upon review, the Court must view the evidence in a light most favorable to the prosecution, and presume that any conflicting facts or inferences will be resolved in favor of the prosecution. Jackson, 443 U.S. at 326. Accordingly, the inference that Petitioner used the treat of force or duress, despite his assertion that the conduct was consensual, must be resolved in favor of the prosecution.

Furthermore, in his traverse, Petitioner asserts that there was no physical evidence such as fingerprints or DNA that linked him to the crime, and that the only evidence against him was the testimony of a woman "who the People presented as borderline retarded." (Traverse, ECF No. 28 at 9.) Petitioner further challenges the victims testimony as inconsistent, and that her statements can be construed as stating that she consented to the sexual acts. (Id. at 9-15.) As previously stated, the Court must view the evidence in a light most favorable to the prosecution. The Court upon review cannot review issues of credibility. Viewing the evidence in the light most favorable to the prosecution, and for the reasons expressed by the state appellate court, there was sufficient evidence introduced at Petitioner's trial to support the jury's verdict. The conclusion of the state court that sufficient evidence supported the guilty verdict in this case is not contrary or an unreasonable application of United States Supreme Court authority. Accordingly, Petitioner is not entitled to relief on this claim.

1    **D.    Claim Four: Cunningham Error**

2          Petitioner contends that, under <u>Cunningham v. California</u>, 549 U.S. 270 (2007), the trial

3    court violated his right to jury trial by imposing an upper term based on facts that were neither

4    found by the jury nor admitted by Petitioner. (Pet. at 7, 9.) This claim is without merit.

5                 1.    Relevant State Court Decision

6          The claim was presented on direct appeal to the Fifth District Court of Appeal. (Lodged

7    Doc. 1.) The appellate court denied the claim in a reasoned decision, stating:

8                The probation officer's report (RPO) recommended imposition of
       concurrent upper-term sentences on each count, based on the existence of
9      several factors in aggravation and none in mitigation. Of particular note, the
       RPO revealed that [Petitioner] had previously been convicted of two counts of
10     aggravated felonious sexual assault in New Hampshire, for which he had served
       a little more than 10 years in prison. The convictions resulted from his having
11     had sex with his minor daughter, who was 15 years old at the time she reported
       the molestation.

12
                At sentencing, defense counsel declined to argue for imposition of the
13     lower term due to [Petitioner's] prior record, but asserted that the middle term
       would be appropriate because of the mitigating circumstances that no more
14     force was used in commission of the present crimes than was necessary to
       commit the acts, and the victim suffered no injuries. The trial court rejected the
15     argument, finding that the facts of the offense did not give rise to any factors in
       mitigation. It imposed the upper term, finding, as factors in aggravation, that
16     [Petitioner] had engaged in violent conduct indicating a serious danger to
       society, that his prior convictions as an adult were numerous, and that he had
17     served a prior prison term. The court found no factors in mitigation.

18                Relying on <u>Cunningham v. California</u> (2007) 549 U.S. ___ [127 S.Ct. 856]
       (<u>Cunningham</u>), <u>Blakely v. Washington</u> (2004) 542 U.S. 296 (<u>Blakely</u>), and
19     <u>Apprendi v. New Jersey</u> (2000) 530 U.S. 466 (<u>Apprendi</u>), [Petitioner] now
       contends the trial court violated his Sixth Amendment right to trial by jury and
20     Fourteenth Amendment right to due process by imposing the upper term based
       on factors not admitted by [Petitioner] or found by the jury to be true beyond a
21     reasonable doubt.

22                Prior to [Petitioner's] sentencing, the California Supreme Court undertook
       an extensive analysis of <u>Apprendi</u>, <u>Blakely</u>, and <u>United States v. Booker</u> (2005)
23     543 U.S. 220 and concluded that imposition of an upper term sentence, as
       provided under California law, was constitutional. (<u>People v. Black</u> (2005) 35
24     Cal.4th 1238, 1244, 1254, 1261 (<u>Black I</u>).)[FN13] Recently, however, the
       United States Supreme Court overruled <u>Black I</u> in part and held that California's
25     determinate sentencing law "violates <u>Apprendi</u>'s bright-line rule: Except for a
       prior conviction, 'any fact that increases the penalty for a crime beyond the
26     prescribed statutory maximum must be submitted to a jury, and proved beyond
       a reasonable doubt.'" (<u>Cunningham</u>, supra, 549 U.S. at p. ___ [127 S.Ct. at p.
27     868].) The middle term prescribed under California law, not the upper term, is
       the relevant statutory maximum. (<u>Ibid.</u>)

28

FN13. In light of Black I, any objection by [Petitioner] at sentencing based on Blakely, Apprendi, or the United States Constitution would have been futile. Accordingly, we reject respondent's claim [Petitioner's] waived the issue by failing to object. (People v. Sandoval (2007) 41 Cal.4th 825, 827, fn. 4 (Sandoval).)

The United States Supreme Court remanded Black I to the California Supreme Court for reconsideration in light of Cunningham. In People v. Black (2007) 41 Cal.4th 799 (Black II), our state high court held that "as long as a single aggravating circumstance that renders a defendant eligible for the upper term sentence has been established in accordance with the requirements of Apprendi and its progeny, any additional fact finding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to a jury trial." (Id. at p. 812.) The court explained that "[t]he facts upon which the trial court relies in exercising discretion to select among the terms available for a particular offense 'do not pertain to whether the defendant has a legal right to a lesser sentence – and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.' Under California's determinate sentencing system, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term. Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in Blakely, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum.'" (Black II, supra, 41 Cal.4th at p. 813, fn. omitted.)

The state Supreme Court rejected the argument that, since a trial court cannot impose the upper term unless it considers all aggravating circumstances and determines they justify the upper term and outweigh any mitigating circumstances, a defendant has the right to a jury trial on all applicable aggravating circumstances even if one has been established in accordance with Blakely. (Black II, supra, 41 Cal.4th at p. 814.) The court stated: "The issue to be determined in each case is whether the trial court's fact increased the sentence that otherwise could have been imposed, not whether it raised the sentence above that which otherwise would have been imposed." (Id. at p. 815.) The court concluded: "[I]mposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (Id. at p. 816.)

In the present case, the RPO revealed that [Petitioner] had previously been convicted of two counts of felonious conduct for which he served a term in prison. [Petitioner] did not challenge the accuracy of this account. Black II, which involved the aggravating circumstance that the defendant's prior convictions were numerous and of increasing seriousness, makes it clear that the trial court's reference here to [Petitioner's] numerous prior convictions and service of a prior prison term fell within the recidivism exception to the jury trial right that consistently has been recognized by the United States Supreme Court. (Black II, supra, 41 Cal.4th at p. 818); see, e.g., Apprendi, supra, 530 U.S. at p. 488; Almendarez-Torres v. United States (1998) 523 U.S. 224, 230, 243, 244.) Since [Petitioner's] criminal history established an aggravating circumstance "that independently satisf[ied] Sixth Amendment requirements and render[ed] him eligible for the upper term," "he was not legally entitled to the middle term, and his Sixth Amendment right to jury trial was not violated by imposition of the

1    upper term sentence …." (<u>Black II</u>, supra, 41 Cal.4th at p. 820.) In short, there
     was no federal constitutional error. (<u>Compare</u> <u>Sandoval</u>, supra, 41 Cal.4th at pp.
2    837-838 [6th Amend. Rights violated by imposition of upper term sentence
     where no aggravating circumstance cited by trial court fell within <u>Blakely</u>
3    exceptions of fact of prior conviction or facts established by jury's verdict or
     admitted by defendant].)

4
5          [Petitioner] contends, however, that the trial court committed error under
     state law by finding "numerous" prior convictions. As [Petitioner] notes, this court
6    has held, under the predecessor to California Rules of Court,[FN14] rule
     4.421(b)(2), that two acts cannot be "numerous." (<u>People v. Berry</u> (1981) 117
7    Cal.App.3d 184, 191.) Nevertheless, [Petitioner] has not shown prejudice. As the
     trial court properly considered [Petitioner's] prior record under rule 4.408(a)
8    (<u>Berry</u>, at p. 191), a single factor in aggravation suffices to support imposition of
     the upper term (<u>People v. Osband</u> (1996) 13 Cal.4th 622, 730), and the trial
9    court correctly found no circumstances in mitigation, it is not reasonably
     probable [Petitioner] would have obtained a more favorable result absent the
10   error. (<u>People v. Watson</u> (1956) 46 Cal.2d 818, 836)

11   [FN14] All references to rules are to the California Rules of Court.

12   (Lodged Doc. 1 at 28-32.)

13          2.    <u>Legal Standard</u>

14          In a line of cases beginning with <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct.
15
16   2348, 147 L. Ed. 2d 435 (2000), the United States Supreme Court addressed the effect of
17
     various states' sentencing schemes, including California's determinate sentencing law, on a
18
     defendant's right to have a jury determine the facts a trial court considers when imposing a
19
20   sentence. In <u>Apprendi</u>, the Court held "[o]ther than the fact of a prior conviction, any fact that
21
     increases the penalty for a crime beyond the prescribed statutory maximum must be submitted
22
     to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490. Following
23
     <u>Apprendi</u>, the United States Supreme Court decided <u>Blakely v. Washington</u>, 542 U.S. 296
24
     (2004). In <u>Blakely</u>, the high court explained that the statutory maximum for <u>Apprendi</u> purposes
25
     "is not the maximum sentence a judge may impose after finding additional facts, but the
26
     maximum he may impose without any additional findings." <u>Blakely</u>, 542 U.S. at 303.

27          The Supreme Court has clearly stated, "[o]ther than the fact of a prior conviction, any
28   fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

     submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi v. New Jersey</u>, 530

     U.S. 466, 490 (2000). Under this rule, the Court later concluded that California's determinate

1   sentencing scheme did not stand up against the Sixth Amendment because it authorized the

2   judge, rather than the jury, to find facts permitting an upper-term sentence. See Cunningham

3   v. California, 549 U.S. 270, 288 (2007).

4       However, sentencing errors must withstand harmless error review which requires the

5   Defendant to show prejudice. See Washington v. Recuenco, 548 U.S. 212, 215 (2006)

6   (sentencing error requires showing of prejudice); Estrella v. Ollison, 668 F.3d 593, 598 (9th

7   Cir. 2011) (same). On habeas review, it must be determined if the error had a substantial and

8   injurious effect or influence on the sentence. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

9   Using that standard, relief must be granted if there is grave doubt that a jury would have found

10  the relevant aggravating factor beyond a reasonable doubt. Estrella, 668 F.3d at 598.

11          3.      Analysis

12      Under these circumstances, it simply cannot be said that Petitioner was prejudiced from

13  the trial court's alleged failure to submit aggravating sentencing factors to the jury. The court

14  based the decision to sentence Petitioner to the upper term sentence based on the

15  aggravating circumstances that Petitioner had numerous prior criminal convictions and he had

16  served a prior prison term. The prior convictions alone justify the upper-term sentence and

17  need not be submitted to the jury. See Apprendi, 530 U.S. at 490. Thus, Petitioner's claim is

18  without merit and he is not entitled to federal habeas relief. To the extent that the trial court

19  based the aggravating sentencing factors on other conduct of Petitioner than his prior

20  convictions, the error was harmless. On federal habeas review, "a court must assess the

21  prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and

22  injurious effect' standard set forth in Brecht." Fry v. Pliler, 551 U.S. 112, 121 (2007). While, the

23  trial court may have stated that the factors were based on 'numerous' prior convictions - i.e.

24  more than two convictions, there was no dispute that Petitioner had two prior aggravated

25  sexual assault convictions, for which he served a prison term. The upper term would have

26  been authorized based the two convictions alone. Finally, Petitioner's contentions in his

27  traverse that the prior convictions must be submitted to a jury and proven beyond a reasonable

28  doubt is in direct contravention of exception set forth in Apprendi. Petitioner's claim is without

1    merit and must be dismissed.

2    **E.      Claim Five: Ineffective Assistance of Counsel - Marsden Motion**

3         Petitioner claims that the trial court's denial of his request for substitute counsel, under

4    People v. Marsden, 2 Cal.3d 118 (1972), violated his right to effective assistance of counsel.

5                 1.      Relevant State Court Decision

6         The claim was presented by way of a petition for writ of habeas corpus to the Fresno

7    County Superior Court. The court denied the claim in a reasoned decision, stating:

8              Petitioner's first argument, that the court should have granted his
       Marsden motion, could and should have been raised as part of his direct appeal
9      because the denial of the motion was apparent from the record. A petitioner
       cannot raise arguments through a petition for writ of habeas corpus that could
10     have been raised through a direct appeal. (In re Clark (1993) 5 Cal.4th 750,
       765-766.) Also, while petitioner claims that his appellate counsel failed to raise
11     the issue because he was ineffective, he has not shown that he would have
       been likely to prevail if the issue had been raised on appeal. Therefore, the
12     petitioner cannot raise the issue now by way of a petition for writ of habeas
       corpus.

13
     (Lodged Doc. 3.)
14
                 2.      Analysis
15
          Where a defendant is proceeding with the assistance of counsel, he may move to
16
     dismiss or substitute counsel, whether appointed or retained. The grant or denial of such a
17
     motion may depend on its timeliness and the nature of the conflict between the defendant and
18
     current counsel. United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000). In assessing on
19
     direct appeal a federal trial court's decision to deny a motion for substitute counsel, three
20
     factors are to be considered: "(1) the timeliness of the motion and the extent of resulting
21
     inconvenience or delay; (2) the adequacy of the court's inquiry into the defendant's complaint;
22
     and (3) whether the conflict between the defendant and his attorney was so great that it
23
     resulted in a total lack of communication preventing an adequate defense." Id. The trial court's
24
     inquiry into a criminal defendant's complaints about his trial counsel must be "adequate to
25
     create a sufficient basis for reaching an informed decision." United States v. Mendez-Sanchez,
26
     563 F.3d 935, 942-943 (9th Cir. 2009) (quoting Musa, 220 F.3d at 1102 (quotation omitted)).
27
          However, the Ninth Circuit has also ruled that in assessing such a claim in the context
28

of a § 2254 proceeding such as this, the focus is different than that on direct review. In Schell

v. Witek, 218 F.3d 1017 (9th Cir. 2000) (*en banc*) the court stated:

> Our primary reason for accepting this case for en banc review was to correct the standard of review we have been using to examine the constitutionality of a state court's handling of a motion to substitute appointed counsel based on allegations of an irreconcilable conflict. In Bland, we said that the test is whether a state court's denial of such a motion was for an "abuse of discretion." Bland, 20 F.3d at 1475.
>
> * * *
>
> [O]ur only concern when reviewing the constitutionality of a state-court conviction is whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). See also Coleman v. Thompson, 501 U.S. 722, 730, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) ("The [habeas] court does not review a judgment but the lawfulness of the petitioner's custody simpliciter.") A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect. Accordingly, to the extent that they conflict with this opinion, we overrule Bland and Crandell v. Bunnell, 144 F.3d 1213 (9th Cir. 1998).

218 F.3d at 1024-25 (footnotes omitted). The court in Schell determined that it was "well

established and clear that the Sixth Amendment requires on the record an appropriate inquiry

into the grounds of [a motion for substitute counsel], and that the matter be resolved on the

merits before the case goes forward." Id. at 1025. See also Hudson v. Rushen, 686 F.2d 826,

829 (9th Cir. 1982) ("Thus, the state trial court's summary denial of a defendant's motion for

new counsel without further inquiry violated the Sixth Amendment.").

Here, Petitioner made the request for substitution of counsel on February 8, 2005,

before his first trial commenced. (Lodged Doc. 18 at 39.) The trial court heard Petitioner's

complaints and denied the motion for substitution of counsel or for Petitioner to proceed pro

se. Petitioner's first trial resulted in a hung jury in February, 2005 and Petitioner's second trial

was not heard until October, 2005. No subsequent motion for substitution of counsel was

made. The same counsel represented Petitioner throughout the first and second trial.

Petitioner contends that defense counsel did not return his calls, did minimal

investigation, and falsified time entries regarding how often he met with Petitioner. (Pet. at 10.)

Petitioner does not contend that the judge did not allow Petitioner to present his case as the

Marsden hearing, or that the Court did not allow Petitioner to present the court with relevant

evidence of defense counsel's alleged ineffectiveness. Instead, Petitioner complains that the court found defense counsel's arguments more persuasive. (See Traverse at 17. "I tried to present the facts as best I could. The court didn't want to listen to me. The court spent more time telling me how lucky I was to have such a fine attorney as Mr. Greigo. Instead of doing an in-depth inquiry into why I was seeking his removal.") After the Marsden hearing, Petitioner continued to be represented by counsel through two criminal trials, but failed to renew his challenge regarding counsel at any time.

As the trial court provided Petitioner an opportunity to be heard and it deliberated regarding his claims, the court's handling of the motion to substitute counsel in this case passes constitutional muster. Schell, 218 F.3d at 1025. Petitioner does not contend that he was not heard, only that the trial court was not persuaded by his arguments. Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Accordingly, the claim should be denied.

## F.    Claim Six: Ineffective Assistance of Counsel

Petitioner claims he was denied his right to effective assistance of counsel and generally questions defense counsel's conduct including his failure to meet with Petitioner despite his requests, defense counsel's short and unfavorable opening statement, defense counsel's demeanor in cross-examining witnesses. (Pet. at 14.) Specifically, Petitioner argues that his trial counsel was ineffective for not introducing evidence that the victim had been banned from her church by the board of elders. (Id.)

### 1.    Relevant State Court Decision

The claim was presented by way of a petition for writ of habeas corpus to the Fresno County Superior Court. The court denied the claim in a reasoned decision, stating:

> [T]o the extent that petitioner contends that the court did not address his ineffective assistance of trial counsel argument, the court notes that petitioner has not shown that his trial counsel's conduct fell below an objective standard of reasonableness or that his actions or inactions caused any actual prejudice to his defense. (Strickland v. Washington (1984) 466 U.S. 668, 690-692.)

1    (Lodged Doc. 5.)

2              2.    Legal Standard

3         The law governing ineffective assistance of counsel claims is clearly established for the

4    purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe,

5    151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective

6    assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S.

7    668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.

8    1994). First, the petitioner must show that counsel's performance was deficient, requiring a

9    showing that counsel made errors so serious that he or she was not functioning as the

10   "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner

11   must show that counsel's representation fell below an objective standard of reasonableness,

12   and must identify counsel's alleged acts or omissions that were not the result of reasonable

13   professional judgment considering the circumstances. Id. at 688; United States v.

14   Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's

15   performance is highly deferential. A court indulges a strong presumption that counsel's

16   conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S.

17   at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

18        Second, the petitioner must demonstrate that "there is a reasonable probability that, but

19   for counsel's unprofessional errors, the result ... would have been different," Strickland, 466

20   U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive

21   defendant of a fair trial, one whose result is reliable. Id. at 687. The Court must evaluate

22   whether the entire trial was fundamentally unfair or unreliable because of counsel's

23   ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d

24   1456, 1461 (9th Cir. 1994).

25        A court need not determine whether counsel's performance was deficient before

26   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

27   Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any

28   deficiency that does not result in prejudice must necessarily fail. However, there are certain

1  instances which are legally presumed to result in prejudice, e.g., where there has been an

2  actual or constructive denial of the assistance of counsel or where the State has interfered

3  with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n.25

4  (1984).

5      As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the standard

6  for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

19  Harrington v. Richter, 131 S. Ct. at 785-86.

20      "It bears repeating that even a strong case for relief does not mean the state court's

21  contrary conclusion was unreasonable." Id. at 786. "As amended by AEDPA, § 2254(d) stops

22  short of imposing a complete bar on federal court relitigation of claims already rejected in state

23  proceedings." Id. "As a condition for obtaining habeas corpus from a federal court, a state

24  prisoner must show that the state court's ruling on the claim being presented in federal court

25  was so lacking in justification that there was an error well understood and comprehended in

26  existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

27      Accordingly, even if Petitioner presents a strong case of ineffective assistance of

28  counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness

1 of the state court decision.

2            3.    Analysis

3         The state court's determination that Petitioner has not made a sufficient showing that

4 he was prejudiced by the actions of defense counsel is reasonable. In order to demonstrate

5 prejudice, Petitioner must show "there is a reasonable probability that, but for counsel's

6 unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694.

7 While Petitioner criticizes the conduct of defense counsel, he does not explain how, if, for

8 example, defense counsel met with Petitioner before trial, the result would have been different.

9 The only witnesses to the criminal acts were Petitioner and the victim, and therefore they were

10 the only witnesses qualified to testify to the events that occurred. Defense counsel could do

11 little else besides challenge the credibility of the victim. Petitioner asserts that defense counsel

12 was ineffective for failing to introduce evidence that the victim had been banned from her

13 church - evidence which he asserts would not exist if she was the victim of sexual assault. The

14 evidence, even if admissible, is purely speculative, and defense counsel's failure to raise it at

15 trial was well within the standards of reasonable conduct. As Strickland notes, "It is all too

16 tempting for a defendant to second-guess counsel's assistance after conviction or adverse

17 sentence." Strickland v. Washington, 466 U.S. at 689.

18         Here, Petitioner was represented by defense counsel at two trials. Petitioner has not

19 mentioned any factual arguments that defense counsel made at the first trial, but failed to

20 make at the second trial. While Petitioner states he continued to complain about Petitioner's

21 conduct after the Masden hearing before the first trial, he failed to formally request another

22 Marsden hearing before the second trial. The state court's decision is given deference, and

23 while defense counsel could have represented Petitioner in a different manner, Petitioner has

24 not shown that the state court's decision was an unreasonable application of Strickland. See

25 Harrington, 131 S. Ct. at 785-86. Petitioner's claim of ineffective assistance of counsel is

26 without merit.

27      **G.    Claim Seven: Ineffective Assistance of Appellate Counsel**

28         Petitioner argues that his appellate counsel was ineffective for not raising claims that

his trial counsel was ineffective for not requesting the dismissal of the jurors and discharge of the venire, and that the trial court erred in not granting his request for the substitution of counsel. (Pet. at 15.)

1.      Relevant State Court Decision

The claim was presented by way of a petition for writ of habeas corpus to the Fresno County Superior Court. The court denied the claim in a reasoned decision, stating:

> Petitioner's claims that he received ineffective assistance of counsel from his appellate counsel, because his appellate counsel failed to argue that the trial court would have overruled his trial counsel's objection to the entire jury venire if his trial counsel had raised the objection. Petitioner cites from a portion of the court transcript in which the trial court indicated that if trial counsel challenged the jury panel, the court would overrule the objection because there were still some African-Americans in the venire. Petitioner claims that this evidence shows that the trial court would have denied trial counsel's challenge to the venire, which would have been clear error. Thus, petitioner argues, his appellate counsel should have raised this error on appeal, and his failure to do so constituted ineffective assistance.

> However, petitioner has failed to show that he received ineffective assistance from his appellate counsel, since the excerpts from the transcript do not establish that the trial court would have overruled an objection to the jury panel even if all of the African-American jurors had been challenged. At most, the transcript shows that the court believed that the challenge was premature because some African-American jurors were still left in the jury panel. It appears that the court was willing to entertain the objection at a later time if the remaining African-American jurors were challenged. Thus, the court never stated that it would overrule an objection to the jury panel even if all African-American jurors were challenged. Therefore, petitioner has failed to show that his appellate counsel was ineffective for failing to raise the argument on appeal.

(Lodged Doc. 4.)

2.      Legal Standard

Where the challenge is to the effective assistance of appellate counsel, the Strickland standard apply in the same manner as claims of ineffective assistance of trial counsel . Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000). It is well settled that an attorney cannot be ineffective for failing to take a futile or meritless action. James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.") (citations omitted); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.") (citation omitted); Boag v. Raines, 769 F.2d 1341, 1344

1  (9th Cir. 1985) (same). Moreover, in <u>Smith</u>, the United States Supreme Court indicated that

2  an appellate attorney filing a merits brief need not and should not raise every non-frivolous

3  claim. <u>Smith v. Robbins</u>, 528 U.S. at 288. Rather, an attorney may select from among them

4  in order to maximize the likelihood of success on appeal. <u>Id.</u>

5          3.    <u>Analysis</u>

6       First, Petitioner argues that appellate counsel was ineffective for not raising the

7  dismissal of the jurors and discharge of the venire in his appeal. The claim lacks merit. As

8  explained earlier, Petitioner did not challenge the juror, and despite the prosecutor's challenge,

9  the court reseated the challenged juror. Petitioner was not the one to challenge the presence

10 of the juror. Furthermore, appellate counsel's failure to include such a claim was not

11 unreasonable. As the court denied the prosecution's challenge, members of the protected

12 class remained on the jury. The prosecutor requested the discharge of the venire, based on

13 the premise that the challenged juror would be offended and biased against the prosecution,

14 but the request was denied. Unlike the prosecutor, Petitioner's counsel did present reasons

15 as to why the action of court was detrimental to Petitioner, did not challenge the presence of

16 the juror, or request discharge of the venire. In light of the action of the trial court, it is

17 reasonable that Petitioner would not be successful bringing a <u>Baston</u> challenge to have the

18 entire pool dismissed in light of the trial court's remedy. Likewise, it was not unreasonable for

19 appellate counsel to omit the claim from Petitioner's appeal.

20      Second, even if the challenge to the trial court's denial of the request for substitute

21 counsel was questionable, appellate counsel was not unreasonable in omitting the claim in the

22 appeal. Appellate counsel does not have a constitutional duty to raise every non-frivolous

23 issue requested by the defendant. <u>Smith v. Robbins</u>, 528 U.S. at 288. To the extent that

24 Petitioner challenged the effectiveness of trial counsel, such claims are better suited to be

25 heard by way of a petition of habeas corpus, and were allowed to proceed in Petitioner's

26 habeas petitions. State procedural bars that prevent appealable claims that can be brought

27 upon direct appeal to be raised in habeas do not apply to claims of ineffective assistance of

28 counsel which are more appropriately raised on habeas corpus. The California Supreme Court

1    has "'repeatedly emphasized that a claim of ineffective assistance is more appropriately

2    decided in a habeas corpus proceeding.'" <u>People v. Jones</u>, 30 Cal. 4th 1084, 1105, 135 Cal.

3    Rptr. 2d 370, 70 P.3d 359 (2003) (quoting <u>People v. Mendoza Tello</u>, 15 Cal. 4th 264, 266-67,

4    62 Cal. Rptr. 2d 437, 933 P.2d 1134 (1997)). In fact, the court has specified that the <u>Dixon</u> rule

5    should not be applied to a claim of ineffective assistance of trial counsel, even if the claim is

6    based solely upon the appellate record. In re Robbins, 18 Cal. 4th 770, 815 n.34, 77 Cal. Rptr.

7    2d 153, 959 P.2d 311 (1998). Petitioner was not barred from bringing a claim in habeas that

8    defense counsel was ineffective, which in effect is the same claim Petitioner made during trial

9    at the Marsden hearing. Appellate counsel did not fall below the level of reasonable conduct

10   by not including the claim, and further, the failure to include the claim was harmless as

11   Petitioner was still able to pursue the substance of the claim in his habeas petitions.

12       Based on the foregoing, the Court finds that Petitioner has failed to show either

13   deficient performance or prejudice. Accordingly, the Court finds that the California court's

14   rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application

15   of, clearly established federal law, as determined by the United States Supreme Court. Thus,

16   habeas relief is not warranted on this claim.

17       **H.    Claim Seven: Restitution**

18       Petitioner challenges the imposition of a $1,600 restitution fine under section 1202.4.9

19   (Pet. at 16.) This claim is not cognizable on federal habeas review. A federal court may

20   entertain a habeas petition "in behalf of a person in custody pursuant to the judgment of a

21   State court only on the ground that he is in custody in violation of the Constitution or laws or

22   treaties of the United States." 28 U.S.C. § 2254(a). The Ninth Circuit has held that "§ 2254(a)

23   does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order

24   imposed as part of a criminal sentence." <u>Bailey v. Hill</u>, 599 F.3d 976, 981-82 (9th Cir. 2010);

25   <u>see also</u> <u>United States v. Thiele</u>, 314 F.3d 399, 400 (9th Cir. 2002) (claim challenging a

26   restitution fine is not cognizable basis for habeas relief because such claims do not challenge

27   the validity or duration of confinement); <u>United States v. Kramer</u> 195 F.3d 1129, 1130 (9th Cir.

28   1999) (same); <u>Williamson v. Gregoire</u>, 151 F.3d 1180, 1183 (9th Cir. 1998) (imposition of fine

1   is "merely a collateral consequence of conviction" and, as such, is not sufficient to establish

2   federal habeas jurisdiction). Accordingly, the claim is without merit and must be denied.

3       **I.   Claim Nine: Parole Term**

4       Petitioner claims that the trial court, instead of the Department of Corrections, should

5   have imposed and informed him of the mandatory parole term under California Penal Code

6   § 3000.10 (Pet. at 16.) Petitioner alleges that he was informed of a mandatory five-year parole

7   period when sent to the prison reception center rather than during trial. (Id.)

8           1.   Relevant State Court Decision

9       The claim was presented by way of a petition for writ of habeas corpus to the Fresno

10  County Superior Court. The court denied the claim in a reasoned decision, stating:

11          Finally, petitioner's argument that the parole term somehow extended his
12      prison sentence is also without merit. Petitioner received an eight-year sentence
        for violating Penal Code section 289(a)(1), as well as a concurrent sentence of
        eight years for violating Penal Code section 288(c)(2). (See abstract of judgment
13      in case no. F04908127-4.) Thus, petitioner received a total sentence of eight
        years. However, under Penal Code section 3000(b)(1), after the expiration of the
14      term of imprisonment, "the inmate shall be released on parole for a period not
        to exceed three years, except that any inmate sentenced for an offense
15      specified in paragraph (3), (4), (5), (6), (11), (16) or (18) of subdivision (c) of
        Section 667.5 shall be released on parole for a period not exceeding five
16      years..." Petitioner's conviction for oral copulation qualifies him for a five-year
        parole under Penal Code section 667.5(c)(5).
17
            In People v. Jefferson (1999) 21 Cal.4th 86, the Supreme Court remarked
18      that "under the present law the prison 'term' is the actual time served in prison
        before release on parole, and the day of release on parole marks the end of the
19      prison term. Unlike the pre-1977 sentencing law, the period of parole is not part
        of a defendant's prison term . . .." (Id. at p. 95.)
20
        "Section 1170.1 is part of the determinate sentence law, which brought 'a basic
21      change in [the] approach to parole . . . . Parole was formerly considered a part
        of the term served in confinement. Under the present scheme, however, the
22      parole period is imposed separately from the term of imprisonment . . . .' Thus,
        while a parolee is deemed in 'custody' until the expiration of the parole period
23      and is in 'constructive custody' for some purposes, the parole period is not part
        of the sentence. Sentence is completed at the end of the stated term of
24      imprisonment." (People v. Reed (1993) 17 Cal.App.4th 302, 307.) Thus,
        imposing a five-year parole after the expiration of petitioner's prison term does
25      not unconstitutionally extend petitioner's sentence, because parole is not
        considered to be part of petitioner's sentence.
26
    (Lodged Doc. 3.)
27
            2.   Analysis
28

1    Petitioner asserts that at the time he was sentenced, the trial court did not inform him

2  of the parole term following the expiration of his eight year prison term. (Pet. at 16.) While the

3  Ninth Circuit has held that a guilty plea is not made voluntarily and intelligently when the trial

4  judge fails to inform a defendant "of a mandatory parole term concomitant to the sentence"

5  (Carter v. McCarthy, 806 F.2d 1373, 1374 (9th Cir. 1986)), the failure to inform a criminal

6  defendant convicted pursuant to a jury trial about mandatory parole does not invalidate the

7  sentence. Petitioner was sentenced as a result of a conviction by a jury and not following a

8  guilty plea, and whether he was aware of the mandatory parole period at the time he was

9  sentenced has no bearing on the validity of his conviction or sentence. Accordingly, petitioner

10 has failed to make a showing of fundamental unfairness as a result of any sentencing error.

11 See Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental

12 unfairness, a state court's misapplication of its own sentencing laws does not justify federal

13 habeas relief.").

14    Furthermore, it should be noted that during sentencing, the trial court discussed terms

15 of Petitioner's parole and thereby gave Petitioner notice that he was subject to parole after

16 serving his sentence. (See Lodged Doc. 17, Rptr's Tr. at 3308 ("And once you're released, the

17 defendant is to have no contact with the victim, but – well, that could be a term of parole under

18 parole supervision.") Petitioner is not warranted to habeas relief with regard to claim nine as

19 Petitioner has not demonstrated that the state court's denial of this claim was contrary to

20 Supreme Court precedent.

21 **V.    CONCLUSION**

22    Petitioner is not entitled to relief as to any of the claims, and the petition for writ of

23 habeas corpus is hereby DENIED.

24 **VI.   CERTIFICATE OF APPEALABILITY**

25    A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal

26 a district court's denial of his petition, and an appeal is only allowed in certain circumstances.

27 Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

28 whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(a) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED:

1    1) The Petition for Writ of Habeas Corpus is DENIED

2    3) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3    4) The Court DECLINES to issue a certificate of appealability.

4

5    IT IS SO ORDERED.

6    Dated:    September 27, 2012          /s/ *Michael J. Seng*
                                          UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28